# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | ) | |
|---|---|---|
| **MATTHEW DAVID SLUSS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-00064 |
| | ) | |
| **U.S. DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

**I.    INTRODUCTION**

Pro se Plaintiff Matthew Sluss received a sentence of 33 years in prison after pleading guilty to one count of advertising child pornography. Since then, Plaintiff has twice requested transfer to his birth country, Canada, to serve his sentence. The U.S. Department of Justice ("DOJ") denied both requests.

This case concerns DOJ's withholding of information sought by Plaintiff under the Freedom of Information Act ("FOIA") regarding the denial of his transfer requests. Specifically, Plaintiff asked for all documents relating to him held by DOJ's International Prisoner Transfer Unit, as well as records concerning policies and guidelines used to decide international transfer requests. DOJ produced some records in full to Plaintiff but entirely withheld or redacted others.

The parties now cross-move for summary judgment. Only two issues remain in dispute: (1) DOJ's withholding of certain information contained in two memoranda addressing Plaintiff's transfer requests and (2) the scope of DOJ's search for policies and guidelines. For the reasons

discussed below, the Court grants in part and denies in part both parties' motions for summary judgment.

## II. BACKGROUND

### A. Factual Background

On March 15, 2012, Plaintiff Matthew Sluss entered a plea of guilty to one count of advertising child pornography. *See* Def.'s Mem. for Summ. J., ECF No. 49 [hereinafter Def.'s Mem.], at 1. Plaintiff is currently serving a 33-year sentence, *id.*, in the Federal Correctional Complex, located in Petersburg, Virginia, Compl., ECF No. 1 [hereinafter Compl.], ¶ 3. Plaintiff is a dual citizen of the United States and Canada. *Id.* In 2013 and 2016, Plaintiff applied to DOJ's International Prison Transfer Unit ("IPTU") for transfer to Canada to serve his sentence, but was denied both times. *See* Pl.'s Mot. for Summ. J., ECF No. 51 [hereinafter Pl.'s Mot.], Pl.'s Stmt. of Facts, ECF No. 51 [hereinafter Pl.'s Facts], ¶¶ 5–6.

On September 12, 2016, Plaintiff submitted two FOIA requests to DOJ. The first asked for all documents "relating to the United States Department of Justice, International Prisoner Transfer Unit's implementation, policies, or guidelines relating to the implementation and procedures used for the analysis of treaty transfers of prisoners to a for[ei]gn country pursuan[t] to the Treaty [b]etween the United States of America and Canada on the Execution [o]f Penal Sentences." Compl., Ex. A, ECF No. 1, at 8.[1] The second requested "all documents, emails, notes, memoranda, and any other written or electronic information related to [Plaintiff's] person as kept by [IPTU]. This request includes, but is not limited to, processing notes from [Plaintiff's] 2013 and 2016 application for a prisoner transfer to Canada." Compl., Ex. B, ECF No. 1, at 11.

---

[1] With respect to page citations for exhibits, the court uses the page number as electronically generated by CM/ECF.

Only after Plaintiff filed this action on January 11, 2017, did DOJ begin to process his request. On March 1, 2017, DOJ's FOIA/PA Unit assigned Plaintiff's request a case number and sent out a search request to IPTU seeking any documents and records responsive to Plaintiff's FOIA requests. Def.'s Mem., Def.'s Stmt. of Facts, ECF No. 49-1 [hereinafter Def.'s Facts], ¶ 7. DOJ asked IPTU to search for: "(1) records related to Plaintiff's requests for prisoner transfer to Canada made in 2013 and 2016; and (2) documents, e-mails, notes, memoranda or other information related to IPTU's implementation, policies, or guidelines used for the analysis of treaty transfers of prisoners to a foreign country pursuant to the Treaty between the United States and Canada." *Id.*

IPTU personnel responded by searching Plaintiff's name in an Oracle computer database. *Id.* ¶ 8. This search yielded 176 pages of records comprising IPTU's case file concerning Plaintiff. *Id.* ¶ 9. DOJ Attorney John E. Cunningham III ("Cunningham") also located 23 pages of records responsive to Plaintiff's request for general policy information by reviewing the DOJ Criminal Division's internet website. *Id.*

On April 12, 2017, DOJ provided Plaintiff with its First Interim Response, which consisted of 23 pages of records, all of which were publicly available on DOJ's Criminal Division website. *See id.* ¶ 12. On August 3, 2017, Defendant made a Second Interim Release to Plaintiff, in which six pages were released in full, 32 pages released in part, and 30 pages withheld in full.[2] *See id.* ¶ 13.

On August 27, 2018, DOJ requested that IPTU conduct a follow-up search for policy-related records. *See id.* ¶ 10. The chief of IPTU searched "IPTU's S-drive, his/her own H-drive, and also

---

[2] Of this release, 99 pages of records originated with BOP, the FBI, and the Executive Office for United States Attorneys ("EOUSA"). DOJ states that it referred 80 pages to BOP, 11 pages to the FBI, and eight pages to EOUSA for processing and direct response to Plaintiff. *See* Def.'s Facts ¶ 13.

his/her own personal files, and further reviewed all documents in folders titled 'IPTU Procedure and IPTU Policy Matters' and 'Canadian Issues' for responsive records." *Id.* Defendant released another 8 pages to Plaintiff on September 27, 2018. *See id*. ¶ 11.

### B. Procedural History

Plaintiff initiated this case under FOIA on January 11, 2017. Meanwhile, Plaintiff was before the D.C. Circuit on a different matter. *See Sluss v. U.S. Dep't of Justice, Int'l Prisoner Transfer Unit*, 898 F.3d 1242 (D.C. Cir. 2018). Years earlier, in 2014, Plaintiff filed a petition for habeas corpus, challenging the denial of a transfer request he made in July 2013. *See id.* at 1246–47. After the district court denied the petition, *see id.* at 1247, Plaintiff appealed. The D.C. Circuit affirmed the district court's decision on July 31, 2018. *See id.* at 1254.

In this matter, Defendant filed, then withdrew, an initial motion for summary judgment. *See* Minute Order, Sept. 10, 2018 (granting Defendant's Motion to Withdraw its Motion for Summary Judgment). The reason for doing so was to conduct additional searches. *See* Def.'s Mot. to Withdraw, ECF No. 45, at 1. The parties then filed cross-motions for summary judgment, which are now before the court.

## III. LEGAL STANDARD

Most FOIA cases are appropriately decided on motions for summary judgment. *See Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). A court may award summary judgment in a FOIA case by relying on the information included in the agency's affidavits or declarations if they are "relatively detailed and non-conclusory." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted). The agency's affidavits or declarations must "describe the documents and the justifications for nondisclosure with reasonably specific detail [and] demonstrate that the

information withheld logically falls within the claimed exemption." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Further, they must not be "controverted by either contrary evidence in the record [or] by evidence of agency bad faith." *Id*.

It is the government agency's burden to prove that it has complied with its obligations under FOIA. *See U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). To prevail on a motion for summary judgment, the agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal quotation marks omitted); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)). "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *Tax Analysts*, 492 U.S. at 142).

## IV. ANALYSIS

The court first addresses the contested withholdings and then turns to the scope of DOJ's search.

### A. DOJ's Withholdings

Although DOJ withheld multiple documents in whole or in part, Plaintiff challenges only the redactions contained in what Plaintiff simply identifies as "Documents 7 and 9." Pl.'s Mot., Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot for Summ. J. and in Support of Pl.'s Mot., ECF No. 51 [hereinafter Pl.'s Mem.], at 3. Plaintiff has attached those two documents as exhibits to his cross-motion. *See* Pl.'s Mot., Pl.'s Exs. A & B, ECF No. 51-1. Each is an internal memorandum written to the Director of Office of Enforcement Operations, addressing Plaintiff's request for transfer to Canada. *See id.* at 2, 10. One is dated February 6, 2014, and the other August 29, 2016. *See id.* DOJ relies on FOIA Exemptions 5, 6, 7(C), and 7(F) to justify its redaction of these records. *See* Third Cunningham Decl., ECF No. 49-2 [hereinafter Cunningham Decl.], Exs., ECF No. 49-3 [hereinafter Cunningham Exs.], at 100–02. The court starts with Exemption 5, then turns to Exemption 7(F), before concluding with Exemptions 6 and 7(C).

#### 1. *Exemption 5*

DOJ asserts the deliberative process privilege under Exemption 5 to justify the withholdings from Documents 7 and 9. *See id.*[3] According to Cunningham, Exemption 5 applies because the records

---

[3] The court is confused and uncertain as to whether the government also asserts the attorney work-product privilege with respect to Documents 7 and 9. DOJ's motion and reply briefs both reference the attorney work-product privilege as to those records, but neither the Cunningham Declaration nor the Vaughn Index make mention of it. *Compare* Def.'s Mem. at 9–10; Def.'s Opp'n to Pl.'s Mot. and Reply in Support of Def.'s Mot., ECF No. 55 [hereinafter Def.'s Reply], at 6 *with* Cunningham Decl. ¶¶ 17–19 *and* Cunningham Exs. 100–02. Moreover, it is doubtful that the attorney work-product privilege applies to Documents 7 and 9, as nothing about them suggests that they were prepared "because of" anticipated litigation. *United States v. Deloitte LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010). Because of the ambiguity in the government's papers, the court does not rule on the applicability of the attorney work-product privilege. If there is a next round of briefing, the government should endeavor to clarify its position.

> preceded the decision about which they pertained—the decision about whether to approve Plaintiff's applications for an international prison transfer from the United States to Canada—and were prepared for the purpose of assisting the decision-makers in making that decision by setting forth the pertinent facts and legal arguments supporting the authors' recommendations about whether to approve the transfer.

Cunningham Decl. ¶ 19. For his part, Plaintiff does not dispute that Documents 7 and 9 were subject to the deliberative process privilege *when created*. *See* Pl.'s Mem. at 11. He argues instead that the records lost their privileged status upon the Director of Enforcement Operations' denials of the transfer requests. In Plaintiff's view, the Director's adoption of the memoranda is evidenced by her marking an "X" next to the word "Deny" in the section titled "OEO Director Decision" and by affixing her signature to the document. *See* Pl.'s Exs. A & B at 8, 15. Plaintiff contends that the Director's denials constitute the agency's final actions, which are not subject to the deliberative process privilege. In response, DOJ insists that the Director's mere marking and signing of Documents 7 and 9 does not mean that the she adopted the memoranda's reasoning, and it is the memoranda's reasoning that the deliberative process protects. *See* Def.'s Reply at 7–8.

Plaintiff is correct that a "document can lose its predecisional character—and the protections of the privilege—if an agency adopts the document as its own." *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 847 F.3d 735, 739 (D.C. Cir. 2017) (citing *NLRB* v. *Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975)); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). "To adopt a deliberative document, it is not enough for an agency to make vague or equivocal statements implying that a position presented in a deliberative document has merit; instead, the agency must make an '*express*[ ]' choice to use a deliberative document as a source of agency guidance." *Judicial Watch*, 847 F.3d at 739 (quoting *Sears*, 421 U.S. at 161). To that end, the D.C. Circuit has observed that "[t]he [Supreme] Court has refused to equate

reference to a report's conclusions with adoption of its reasoning, and it is the latter that destroys the privilege." *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1197 (D.C. Cir. 1991). In other words, for the Exemption 5 protection to dissipate by virtue of an express adoption, the agency must accept the document's reasoning, not merely its conclusions. *See Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 10–11 (D.C. Cir. 2014).

The D.C. Circuit's decision in *Abtew v. U.S. Department of Homeland Security* provides a useful comparator to the facts presented here. In *Abtew*, the plaintiff sought to obtain the agency's "Assessment to Refer," which is a document that summarizes an asylum seeker's interview, evaluates the applicant's credibility, and makes a recommendation as to granting asylum. *See* 808 F.3d 895, 898 (D.C. Cir. 2015). The Assessment to Refer's author submits the document to an agency supervisor, who makes the final asylum decision. *See id.* The agency withheld the Assessment from the plaintiff under Exemption 5, and the D.C. Circuit agreed with that determination. *See id.* at 899. In so holding, the court rejected the plaintiff's contention that the Assessment had lost its privileged character because the agency adopted it. Specifically, the plaintiff had pointed to the reviewing supervisor's initialing of the Assessment, but the court stated that "initialing alone does not transform the Assessment into the Department's final decision." *Id.* "Initialing a memo may suggest approval of a memo's bottom-line recommendation," the court explained, "but it would be wrong and misleading to think that initialing necessarily indicates adoption or approval of all the memo's reasoning." *Id.*

In this case, if all the court had before it were agency memoranda that the Director of the Office of Enforcement Operations had signed and marked with an "X" to indicate a denial of transfer, *Abtew* would compel a ruling in favor of DOJ. But Documents 7 and 9 contain an unexplained feature that gives the court pause before reaching a final conclusion. Appearing next

8

to each denial decision are "Denial Codes." *See* Pl.'s Exs. A & B at 8, 15. The Denial Codes are the same for each memorandum: "SROC," "CRIM," "DOMY," and "NOCT." *Id.* The term "Denial Code" could signify the *Director's* reasons for denying Plaintiff's request. If that is what they mean, then query whether the Denial Codes correspond to the reasoning contained in the memoranda. If they do align, then perhaps the agency has "expressly adopted" the author's reasoning as its own, in which case the document's predecisional character would cease. But this is all pure conjecture. The agency has not supplied the court with any evidence regarding the Denial Codes, their meaning, and their relationship to the memoranda's reasoning. Without such information, the court cannot determine if the Director's "Deny" checkmark and signature on each document constitutes an express adoption of the document's reasoning or something else. *See Abtew*, 808 F.3d at 899 n.1 (stating that "we do not rule out the possibility that initialing a memo together with other circumstances might indicate agency adoption of that memo in some cases").

DOJ's silence on a related matter gives additional reason to pause. It turns out that DOJ produced a letter to a Canadian official on March 5, 2014, explaining the reasons for denying Plaintiff's transfer request. *See Sluss*, 898 F.3d at 1253. According to the letter, signed by Paula Wolf, Chief of IPTU, DOJ denied Plaintiff's transfer request "because of the seriousness of the offense, because the applicant has become a domiciliary of the United States, because the prisoner is a poor candidate due to his criminal history and because the prisoner has insufficient contacts with the receiving country." *Id.* (quoting Letter, Paula A. Wolf, Chief, Int'l Prisoner Transfer Unit, Crim. Div., U.S. Dep't of Justice, to Chris Hill, Instit'l Reintegration Ops., Corr'l Serv., Canada (March 5, 2014) ("Wolf Letter"). Neither DOJ's briefing nor the Cunningham Declaration refer to the Wolf Letter. Yet, it may be that the reasons offered in the Wolf Letter correspond to the Denial Codes found on Document 9: "seriousness of the offense" – "SROC" (the "C" could

9

stand for conduct); "domiciliary of the United States" – "DOMY"; "criminal history" – "CRIM"; and "insufficient contacts with the receiving country" – "NOCT." If the court's speculation bears out, then it may be that Document 9 lost its predecisional character not only by virtue of it being signed by the Director of the Office of Enforcement Operations, but also by virtue of the Wolf Letter. DOJ, however, offers no facts to answer these open questions.[4]

A disputed issue of material fact therefore remains as to whether DOJ expressly adopted the reasoning of Documents 7 and 9. Accordingly, the court denies without prejudice both parties' motions for summary judgment as to the Exemption 5 redactions. DOJ shall re-evaluate its invocation of Exemption 5 in light of the court's reasons for denying summary judgment.

   2.   *Exemption 7(F)*

FOIA Exemption 7(F) protects from disclosure records or information "compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). Exemption 7(F) involves no balancing test; it "is an absolute ban against [disclosure of] certain information." *Raulerson v. Ashcroft*, 271 F. Supp. 2d 17, 29 (D.D.C. 2002). The D.C. Circuit has described the reach of Exemption 7(F) as "expansive." *See Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 777 F.3d 518, 526 (D.C. Cir. 2015).

Plaintiff challenges the invocation of Exemption 7(F) in two ways. First, he argues that the records in question do not qualify as records "compiled for law enforcement purposes." *See* Pl.'s

---

[4] Yet another letter might be relevant to determining whether DOJ expressly adoption Document 9. On August 12, 2014, Wolf sent a letter to Plaintiff explaining why DOJ had denied his motion for reconsideration. One of the reasons cited by Wolf—there may be others—for the denial was that the hardships associated with being incarcerated in a foreign country were "inapplicable to an inmate [such as Plaintiff] who has resided in the United States for a lengthy period of time with the intention to remain in this country, and whose immediate family members are living here." *Sluss*, 898 F.3d at 1253 (quoting Wolf Letter to Matthew Sluss (Aug. 12, 2014)). DOJ must consider the contents of this additional letter in determining whether Exemption 5 applies to Document 9.

10

Mem. at 14–15. Second, Plaintiff asserts that Exemption 7(F) cannot be invoked to protect the *requester* and, in any event, he "affirmatively waives any such protection." *Id.* at 17. Plaintiff also offers a compromise: release of the redacted information not to him but to his counsel in a related matter, who has agreed to act as custodian of the records. *Id.* at 15. The court finds that the first argument is without merit, while the second deserves closer attention.

a. <u>"Compiled for law enforcement purposes"</u>

Plaintiff argues that the documents at issue here were not "compiled for law enforcement purposes," as required for any Exemption 7 withholding, because IPTU does not "perform any investigations of criminal activity which could 'result in civil or criminal sanctions.'" Pl.'s Mem. at 14–15 (citing *Rural Hous. All. v. Dep't of Agric.*, 498 F.2d 73, 81 (D.C. Cir. 1974)). DOJ insists otherwise, asserting that its "evaluation of Plaintiff's transfer request is part of its law enforcement responsibility to enforce the federal criminal code and rules, and to protect against terrorism." Def.'s Mem. at 13 (citing Cunningham Decl. ¶ 8).

A record is "compiled for law enforcement purposes" so long as there is (1) a rational "nexus" between the record and the agency's law enforcement duties and (2) a "connection between the assertedly exempt records and an inquiry into a 'possible security risk or violation of federal law.'" *See Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017) (citation omitted); *Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998). The term "law enforcement" in this context means "the act of enforcing the law, both civil and criminal." *Sack v. Dep't of Defense*, 823 F.3d 687, 694 (D.C. Cir. 2016) (citation omitted). Courts apply a "more deferential attitude" towards claims of law enforcement purpose when, as here, a criminal law enforcement agency makes the assertion. *See Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982). IPTU operates within DOJ's

11

Criminal Division. *See International Prisoner Transfer Program*, THE UNITED STATES DEPARTMENT OF JUSTICE, https://www.justice.gov/criminal-oia/iptu (last visited June 11, 2019).

Applying this broad construct to the present facts, the court finds that Documents 7 and 9 were "compiled for law enforcement purposes." IPTU's function here was to apply the Treaty on the Execution of Penal Sentences between the United States of America and Canada on the Execution of Penal Sentences. *See Sluss*, 898 F.3d at 1246 (citing 30 U.S.T. 6263 (1978)). The Treaty's purposes are "to promote rehabilitation of individuals incarcerated away from their home countries . . . and thus permit their successful reintegration into society" and "to promote diplomatic and law enforcement relations by relieving strains that arise from imprisonment of large numbers of foreign nationals." *Id.* In making transfer decisions, the Treaty directs each country to consider "all factors" relating to the person's "best interests," 30 U.S.T. 6263 Art. III, ¶ 6, and "in doing so consider how those interests dovetail with the Treaty's rehabilitative purpose," *Sluss*, 898 F.3d at 1252. An applicant's personal interests are not controlling, however, and DOJ may take account of other factors in deciding on a transfer request. *See id.* at 1253. Thus, IPTU makes determinations concerning an individual offender's rehabilitation and reintegration into society, which includes weighing public safety. Such decisions fall within the heartland of law enforcement duties and responsibilities. *Cf. Quinto v. Dep't of Justice*, 711 F. Supp. 2d 1, 6 (D.D.C. 2010) (finding that "communications to the [Bureau of Prisons] from the U.S. Attorney's office regarding an inmate's placement within the network of institutions under BOP control [ ] are clearly related to the enforcement of federal laws"); *Linn v. Dep't of Justice*, No. 92-cv-1406 (GK), 1995 WL 631847, at *35 (D.D.C. Aug. 22, 1995) (holding that "information disclosed to parole hearing examiners to aid in their parole decisions furthers the purposes of law enforcement"). Defendant therefore has established that Documents 7 and 9 were compiled for law enforcement purposes.

b. "Endanger the life or physical safety of any individual"

The second part of Exemption 7(F) requires the government to show that disclosure of the law enforcement record or information "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). Here, DOJ invokes Exemption 7(F) to protect *Plaintiff's* own safety. Plaintiff responds with three related arguments: (1) Exemption 7(F) cannot be invoked to protect the requester of information, (2) he "waives" any concern about his personal safety, and (3) depositing the records with his former counsel alleviates the claimed safety risk.

The plain text of FOIA does not support Plaintiff's first argument that Exemption 7(F) does not apply to him as the requester of information. Exemption 7(F) "does not require that a particular kind of individual be at risk of harm; 'any individual' will do." *Public Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 205 (D.C. Cir. 2014). "While courts generally have applied [FOIA] Exemption 7(F) to protect law enforcement personnel or other specified third parties, by its terms, the exemption is not so limited; it may be invoked to protect 'any individual' reasonably at risk of harm." *Long v. Dep't of Justice,* 450 F. Supp. 2d 42, 79 (D.D.C. 2006) (quoting 5 U.S.C. § 552(b)(7)(F)). At least one judge in this District has expressly held that Exemption 7(F) can be used to protect the requester. *See Mosby v. Hunt*, No. 09-cv-1917 (JDB), 2010 WL 2794250, at *1 (D.D.C. July 15, 2010), summarily aff'd, No. 10-5296, 2011 WL 3240492 (D.C. Cir. July 6, 2011). The court concurs with that conclusion.

Nor does the court agree with Plaintiff that a requester can "waive" the government's concern about his personal safety. At least one judge has held that a requester can "waive" the risk of harm under 7(F), *see Boehm v. FBI*, 948 F. Supp. 2d 9, 36 (D.D.C. 2013), but in this court's

view, the text of FOIA does not grant a requester the unilateral authority to negate an otherwise applicable exemption.

That said, this case presents facts that convince the court that DOJ has failed to carry its burden of showing a *reasonable* expectation that Plaintiff's safety would be at risk if the material in question were disclosed. "In reviewing claims under [FOIA E]xemption 7(F), courts have inquired whether there is some nexus between disclosure and possible harm and whether the deletions were narrowly made to avert the possibility of such harm." *Antonelli v. Fed. Bureau of Prisons*, 623 F. Supp. 2d 55, 58 (D.D.C. 2009) (citing *Albuquerque Pub. Co. v. Dep't of Justice*, 726 F. Supp. 851, 858 (D.D.C. 1989)); *see also Linn*, 1995 WL 631847, at *8 (inquiring as to "whether there is some nexus between disclosure and possible harm"). The court will accord deference to the agency's assessment of danger, but only when it supplies facts to support it. *See id.* at *9; *see also Campbell*, 164 F.3d at 32 (holding that, because the FBI specializes in law enforcement, "its decision to invoke exemption 7 is entitled to deference," but the court's review is not "vacuous").

Here, the Cunningham Declaration devotes little attention to explaining the risk of harm Plaintiff would face from disclosure. Cunningham states that Documents 7 and 9 contain "detailed and graphic information pertaining to Plaintiff's underlying criminal offense," and "[i]n light of" that fact "it is reasonable to expect that the release of any such derogatory information would place Plaintiff at even greater risk of harm from the general prison population within the confines of a federal correctional facility." Cunningham Decl. ¶ 29. This single-sentence justification is problematic for a host of reasons. First, Cunningham's rationale is conclusory. He offers no facts whatsoever to support it. Second, Cunningham does not purport to be an expert in prison safety nor does he indicate that he consulted with anyone who does have such expertise or experience.

Third, Cunningham is wrong that Plaintiff resides in the "general prison population." As Plaintiff explains, he resides in a designated Sex Offender Management Program Facility, at which the majority of inmates are sex offenders or have past sexual offense convictions. *See* Pl.'s Mot., Decl. of Matthew Sluss, ECF No. 51 at 3–5, ¶ 7. Plaintiff's placement in a sex offender facility theoretically could lessen the risk of physically possessing records that describe his offense conduct.

In view of these deficiencies, the court could seek more facts from the agency to support invocation of Exemption 7(F). But two factors counsel otherwise. The first is that Plaintiff has disclaimed personal safety concerns with respect to the records. While a requester cannot unilaterally nullify a safety risk, the fact that he expresses no concern over his safety—in a prison setting no less—can enter into the court's risk evaluation. *See Boehm*, 948 F. Supp. 2d at 36 (holding that "[g]iven that plaintiff has waived any concern for his own safety, the Court finds that Exemption 7(F) is inapplicable"); *cf. Ray v. FBI*, 441 F. Supp. 2d 27, 37 (D.D.C. 2006) (finding Exemption 7(D) inapplicable "[i]n light of [plaintiff's] apparent waiver [of Exemption 7(D)'s confidential informant protection]," because "the Court [wa]s not inclined to protect plaintiff from information about himself"). The second, and more significant factor, is that Plaintiff's former counsel has agreed to act as the custodian of the records in question, thereby eliminating the risk of harm to Plaintiff altogether. DOJ summarily rejects this option out of hand, simply because Plaintiff did not designate a third-party custodian in his original FOIA request. Def.'s Reply at 9. But that standard is entirely unrealistic. The ordinary FOIA requester will not be able anticipate the assertion of any specific exemption, let alone designate a third-party custodian as a prophylactic measure. What's more, DOJ already has demonstrated a willingness to allow Plaintiff access to another similar document through a third party. DOJ released Plaintiff's Presentence Investigative Report but placed it in the custody of the prison facility, even though DOJ deemed

15

that Plaintiff's "possession of [the Report] could reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of the institution in which you are incarcerated." Cunningham Decl. ¶ 31. DOJ does not explain why Documents 7 and 9 could not receive similar treatment.

Accordingly, the court finds in favor of Plaintiff as to information withheld based on Exemption 7(F). Such information, however, must be released only to Erica Hashimoto, Plaintiff's legal advisor, who must retain physical possession of the records. Alternatively, DOJ can treat Documents 7 and 9 in the same manner as the Presentence Report. In so ruling, the court assumes that there is factual matter in Documents 7 and 9 that is segregable from any claimed Exemption 5 material. Only such factually segregable material need be released at this juncture. If Exemption 5 is ultimately determined not to apply, by either the agency or the court, DOJ may withhold no factual information based on Exemption 7(F).

3. *Exemption 6 and 7(C)*

The final exemptions asserted by DOJ are Exemptions 6 and 7(C). Both protect personal privacy, but because Exemption 7(C) offers greater protection than Exemption 6, the court considers only Exemption 7(C). *See Am. Civil Liberties Union v. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011). Here, DOJ withheld "the names and/or identifying information of third-party individuals and lower-level government employees." Cunningham Decl. ¶ 27.

Plaintiff objects to the assertion of 7(C) in two ways. First, he contends that Documents 7 and 9 were not compiled for law enforcement purposes. *See* Pl.'s Mem. at 19. The court already has rejected that argument. Second, he contends that, whatever privacy interest might exist, it is outweighed by Plaintiff's and the public's interest in exposing the agency's "illegal activity" of "fail[ing] to consider his best interests as required by the US-Canada Treaty." *Id.* at 20. But that

16

argument is foreclosed by the D.C. Circuit's decision in *Sluss*. The court held in *Sluss* that DOJ did *not* act unlawfully by denying Plaintiff's transfer requests. *See* 898 F.3d at 1253. Thus, where, as here, there is no genuine public interest in the requested material, an individual's privacy interest must prevail under Exemption 7(C). *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) (stating that, "something, even a modest privacy interest, outweighs nothing every time").

The court thus grants summary judgment in favor of DOJ with regard to redactions based on Exemptions 6 and 7(C).

### B. Adequacy of Search

Lastly, Plaintiff objects to the adequacy of Defendant's search with respect to "documents related to the IPTU's implementation – or the application of – the US-Canada Treaty." Pl.'s Mem. at 23. Specifically, Plaintiff challenges DOJ's failure to explain why the drives searched by the chief of IPTU were "the only reasonable place to look." *Id.* at 22 (citing *Aguiar v. Drug Enf't Admin.* 865 F.3d 730, 739 (D.C. Cir. 2017)).

Plaintiff is right. Recall, the chief of IPTU made a "supplemental search" of "IPTU's S-drive, his/her own H-drive, and also his/her own personal files, and further reviewed all documents in folders entitled 'IPTU Procedure and IPTU Policy Matters' and 'Canadian Issues' for responsive records." Cunningham Decl. ¶ 12. This sparse description suffers from two flaws. First, as Plaintiff points out, although Cunningham identifies the locations searched, he does not explain why a search of "no other record system was likely to produce responsive documents," and he does not "show, with reasonable detail" that the agency's approach "was reasonably calculated to uncover all relevant documents." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also Aguiar*, 865 F.3d at 739. Second, Cunningham's search description falls short because it "does

not disclose the search terms . . . and the type of search performed." *Aguiar*, 865 F.3d at 738 (citation omitted). The court is told that the chief of IPTU searched for electronic records and where he looked for them, but not how he went about performing the search and what search terms, if any, he used. The court therefore cannot grant summary judgment to DOJ on the adequacy of its search.

## V.     CONCLUSION

For the foregoing reasons, the court grants in part and denies in part Defendant's Motion for Summary Judgment, and grants in part and denies in part Plaintiff's Cross-Motion for Summary Judgment. In summary, (1) there remains a genuine dispute of material fact as to whether DOJ expressly adopted Documents 7 and 9 as its final decision; (2) Plaintiff has established that the information withheld on Exemption 7(F) grounds does not pose a reasonable risk to his safety if released to a third party; (3) DOJ properly withheld information pursuant to Exemptions 6 and 7(C); and (4) DOJ has not yet demonstrated the adequacy of its search.

By no later than June 27, 2019, DOJ shall file a Status Report indicating how it intends to proceed in this matter.

Dated: June 14, 2019

Amit P. Mehta
United States District Court Judge